UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LEVI L. JOHNSON,

        Petitioner,

v.                           Case No. 3:04-cv-173-J-12MMH

JAMES R. MCDONOUGH,[1] et al.,

        Respondents.

_____

**ORDER**

**I. Status**

Petitioner, an inmate of the Florida penal system who is proceeding *pro se*, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) pursuant to 28 U.S.C. § 2254 on March 10, 2004. He challenges his September 28, 2001, state court (Duval County) conviction for possession of a firearm by a convicted felon on the following grounds: (1) counsel was ineffective for failing to object to the introduction of inadmissible evidence of the crime of aggravated battery, which became a feature of the trial; and, (2) counsel was ineffective for leading the Petitioner to believe that the defense of necessity or justification would be employed at trial, but the trial court refused to give such an instruction on the ground that it was inapplicable.

_____

[1] James R. McDonough, the Interim Secretary of the Florida Department of Corrections, is substituted as the proper party Respondent for James V. Crosby, Jr., pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

On May 12, 2004, Respondents filed a Response to Petition for Habeas Corpus Relief (Doc. #5) (hereinafter Response).[2] Petitioner's Traverse to the Answer and/or Motion for Fact-Finding Procedures (Doc. #6) was filed on May 26, 2004.  Thus, this case is ripe for review.

## II. Relevant Procedural History

On August 25, 2000, Petitioner was charged by information with possession of a firearm by a convicted felon.  Ex. A at 10-11.  On August 15, 2001, after a trial by jury, Petitioner was found guilty as charged.  Id. at 90.  On September 28, 2001, the trial court adjudicated Petitioner guilty of this offense and sentenced him to eight years of imprisonment.  Id. at 95-100.

On appeal, Petitioner claimed that the trial court abused its discretion in failing to give the requested jury instruction on necessity or justification.  Ex. B.  On June 24, 2002, the First District Court of Appeal per curiam affirmed the judgment of conviction, without issuing a written opinion.  Ex. E at 2.  The mandate issued on July 10, 2002.  Id. at 1.

On November 18, 2002, Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850, in which he raised the same two ineffectiveness claims that he presents in the

---

[2] The Court hereinafter refers to the exhibits submitted with the Response and the exhibit appended to the November 14, 2005, Supplemental Exhibit List for Response to Petition for Habeas Corpus Relief (Doc. #11) as "Ex."

Petition before this Court.  Ex. F at 1-10.  On August 26, 2003, the trial court denied the motion.  Id. at 11-13.  Petitioner appealed the trial court's order, and on January 26, 2004, the First District Court of Appeal per curiam affirmed the trial court's order, without issuing a written opinion.  Id. at 44; Ex. G.

Respondents contend that this action was timely filed. Response at 2-3.  This Court agrees.

### III.  Evidentiary Hearing

A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief.  Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293 (1963)).  Here, the pertinent facts of the case are fully developed in the record before the Court.  Smith, 170 F.3d at 1054 (stating that a district court does not need to conduct an evidentiary hearing "if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel").  No evidentiary proceedings are required in this Court.  See High v. Head, 209 F.3d 1257, 1263 (11th Cir. 2000) (citing McCleskey v. Zant, 499 U.S. 467, 494 (1991)), cert. denied, 532 U.S. 909 (2001).  The Court can "adequately assess [Petitioner's] claim[s] without further factual

development." Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004). Therefore, for the reasons set forth above, an evidentiary hearing will not be conducted by this Court.

### IV.  Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claim under 28 U.S.C. § 2254(d), as amended by AEDPA. Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert. denied, 538 U.S. 926 (2003); Fugate v. Head, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), cert. denied, 535 U.S. 1104 (2002); Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998), cert. denied, 531 U.S. 840 (2000).

The Eleventh Circuit has described the standard of review under AEDPA and has explained:

> The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this [action] and limits our review of the decisions of the state courts:
>
> > A federal court may not grant a petition for a writ of habeas corpus to a state prisoner on any claim that has been adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law,

4

or (2) resulted in a decision that
was based on an unreasonable
determination of the facts in light
of the evidence presented in state
court.

Clark v. Crosby, 335 F.3d 1303, 1307-08 (11th
Cir. 2003) (citations omitted).  A general
framework of substantial deference governs our
review of every issue that the state courts
have decided:

> [A] state-court decision can be
> "contrary to" this Court's clearly
> established precedent in two ways.
> First, a state-court decision is
> contrary to this Court's precedent
> if the state court arrives at a
> conclusion opposite to that reached
> by this Court on a question of law.
> Second, a state-court decision is
> also contrary to this Court's
> precedent if the state court
> confronts facts that are materially
> indistinguishable from a relevant
> Supreme Court precedent and arrives
> at a result opposite to ours.

> . . . .

> [A] state-court decision can
> involve an "unreasonable
> application" of this Court's clearly
> established precedent in two ways.
> First, a state-court decision
> involves an unreasonable application
> of this Court's precedent if the
> state court identifies the correct
> governing legal rule from this
> Court's cases but unreasonably
> applies it to the facts of the
> particular state prisoner's case.
> Second, a state court decision also
> involves an unreasonable application
> of this Court's precedent if the
> state court either unreasonably
> extends a legal principle from our
> precedent to a new context where it

5

> should not apply or unreasonably
> refuses to extend that principle to
> a new context where it should apply.
>
> Williams v. Taylor, 529 U.S. 362, 405-07, 120
> S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000).

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th

Cir. 2005).

The Eleventh Circuit addressed the application of the

"contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of
> AEDPA, we have recognized that where no
> Supreme Court precedent is on point, "we
> cannot say that the state court's conclusion
> . . . is contrary to clearly established
> Federal law as determined by the U.S. Supreme
> Court." McIntyre v. Williams, 216 F.3d 1254,
> 1258 (11th Cir. 2000).

Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir.), cert.

denied, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine

whether the state court's adjudication resulted in a decision that

was based on an unreasonable determination of the facts in light of

the evidence presented in the state court proceeding. Furthermore,

AEDPA "also directs that a presumption of correctness be afforded

factual findings of state courts, which may be rebutted only by

clear and convincing evidence. See id. at § 2254(e)(1). This

presumption of correctness applies equally to factual

determinations made by state trial and appellate courts." Bui v.

<u>Haley</u>, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 906 (2003). <u>See</u> <u>Peoples v. Campbell</u>, 377 F.3d 1208, 1227 (11th Cir. 2004), <u>cert</u>. <u>denied</u>, 125 S.Ct. 2963 (2005). Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

### V. The Testimony at Trial

Maurice Stevens was the first witness called by the state. He testified that he had known the Petitioner for approximately two and a half years. Ex. H at 139-40. On July 17, 2000, between 4:30 p.m. and 5:00 p.m., Maurice and his cousin, James Stevens, saw the Petitioner on the porch of his residence. <u>Id</u>. at 140-41. The Petitioner asked them if they wanted to ride with him to a barbershop so that he could pay the barber some money he owed him. <u>Id</u>. at 140. When they reached the barbershop, the Petitioner reached into his pocket, but there was no money in his pocket. <u>Id</u>. "[H]e had a hole in his pocket so he assumed that [Maurice] took

his money because [Maurice] was in the front seat." Id. Maurice tried to help Petitioner locate the missing money, but they were unable to find it. Id. at 141.

Later that evening, Maurice Stevens, Fiellah Teague, Carl Randall and James Stevens saw the Petitioner as he was sitting on his car outside of his apartment complex. Id. at 143. Maurice asked the Petitioner if he had found the missing money, and the Petitioner replied, "no." Id. The Petitioner said "it's kind of strange for two people being in the car and his money come up missing like that." Id. Then, the Petitioner hit Maurice on the left cheek with a gun. Id. at 144. Maurice had not made any movement towards the Petitioner before Petitioner struck him with the gun. Id.

At this point, the Petitioner "started pointing the gun at everyone that was around him." Id. Maurice lunged at the Petitioner when he pointed the gun at him. Id. at 145. Maurice was furious at this point because the Petitioner had blamed him for something he had not done and hit him "for something [he] didn't do in the first place." Id. The Petitioner backed up two or three steps and then fired the gun twice. Id. The first shot hit the ground by Maurice's feet and the second shot went through his hand and into his stomach. Id. at 145-46.

Maurice reached for the gun and fell on top of the Petitioner. Id. at 146-47. Maurice's aunt, Lynette McClary, pulled Maurice off

of the Petitioner, and then the Petitioner went upstairs into his residence.  Id. at 147.  Maurice was furious, and "went upstairs after him."  Id.  The door was locked, but eventually the Petitioner opened the door.  Id. at 148.  Maurice saw the Petitioner wiping the gun with a white cotton towel and then the Petitioner closed the door again.  Id.  Neither Maurice nor anyone who was with him that day at the scene possessed a gun.  Id. at 149-50.  On cross-examination, Maurice admitted that, at the time in question, he was not in his right mind "partly because [he was] intoxicated."  Id. at 150-51.

Carl Randall testified that he saw the Petitioner in the parking lot of the apartment complex on the day in question.  Id. at 158-60.  He heard the Petitioner say that he was going to shoot Maurice because he thought Maurice had stolen money from him.  Id. at 160-61.  At this point, Carl and his cousin Fiellah got into a car and drove around looking for Maurice.  Id. at 162.  They located Maurice and then the three of them returned to the parking lot at the apartment complex.  Id.  Maurice and the Petitioner "started talking and they got loud."  Id.  Carl heard gunshots and saw the Petitioner with a gun in his hand.  Id. at 162-63.  After the Petitioner shot Maurice, Carl saw the Petitioner walk up the steps to his apartment.  Id. at 163.

James Burnett, a police officer with the Jacksonville Sheriff's Office, testified that he was dispatched to the scene of

the shooting.  Id. at 178-79.  He took custody of the suspect, whom he identified at trial as the Petitioner.  Id. at 179-80.  Before Officer Burnett asked the Petitioner anything about the incident, the Petitioner "stated that he was sorry that he had shot the man, that it was an accident.  He hadn't meant to shoot him."  Id. at 180.

Later that evening, Officer Burnett advised Petitioner of his rights, and the Petitioner gave Officer Burnett a written statement regarding the incident.  Id. at 181-84.  At trial, Officer Burnett read Petitioner's written statement.[3]

> THE WITNESS:  As I, Levi, was sitting on my car outside where I live, I am not sure what that word is.  I think it says Fiellah, brought his cousin around to see me about some money and a license.  Before he brought his cousin who had just left from smoking pot and drinking beer next door I told him to make sure his cousin don't try nothing because we had a discussion earlier about the same so we began talking.
>
> I am still sitting on my car.  That's when he started walking towards me, so I got up and started walking backwards.  When he got too close I swing.  That's when he charged me and I said I have a gun but he kept coming.  I was so scared I didn't want to slow so I start back pedaling trying not to shoot him.
>
> So I told anyone to get -- I am not sure what that word is and he kept coming.  I fell. That's when the gun went off but he kept

---

[3] The written statement has not been provided to the Court.  The following portion of the record is quoted verbatim.  The Court notes that many portions of the statement, as read by Officer Burnett, are not grammatically correct and do not make sense.

coming and coming, so when I realized he was
shot that's when I realized he was -- I think
that says bleed.   Continue with the second
page?

BY MR. BOSTON[4]:

   Q.   Yes, sir.

   A.   So I immediately trying to get him
to go to the hospital but he shot him --
insanity and trying to get at me even after I
went in my home.  He had to be restrained by
his own family but he kept coming.  I am not
sure if that word is blood.  I can't tell --
everywhere.   I guess it's blood everywhere.
He is still trying to get at me and the only
reason I had the gun because sitting outside
over he lives to be expect or -- I can't read
that word, which has happened to several folks
in the apartments, and that's the end of it.

Id. at 186-87.

Petitioner also told Officer Burnett that he had obtained the

gun prior to Maurice's arrival because Maurice had a reputation for

violence.  Id. at 188-89.  Petitioner told Officer Burnett that he

was afraid of a confrontation with Maurice.  Id. at 189.  He told

Officer Burnett that the gun accidentally discharged when he was

retreating from Maurice.  Id.  After Officer Burnett's testimony,

the state rested.  Id. at 192.

The Petitioner was the sole witness for the defense.  He

testified that on the day in question, he drove into the parking

lot at his apartment complex at approximately 4:00 p.m.  Id. at

---

   [4] Mr. Ken Boston was the Assistant State Attorney who prosecuted
Petitioner.  Ex. H at 99.

200. He parked his car in front of the steps leading to his second-floor apartment and proceeded to his apartment. Id. at 198-201. He was planning to run some errands later that day (paying a barber for cutting his hair the previous Sunday and picking up a package from the United Postal Service). Id. at 201.

Maurice and James Stevens knocked on Petitioner's apartment door and, after he answered the door, they asked him if he could take them to buy some marijuana. Id. at 202. Petitioner agreed to drop them off on his way to run his errands. Id. He and Maurice had been acquaintances for approximately two to three years. Id. Petitioner had between $80.00 and $90.00 when he left his residence. Id. at 204.

Maurice got into the front passenger seat of Petitioner's car and James sat in the back seat, on the passenger side of the car. Id. at 203. Petitioner drove to Kings Road so that Maurice and James could purchase the marijuana. Id. Maurice and James did not have enough money to buy the marijuana, so the Petitioner gave them a few dollars. Id. Petitioner dropped either Maurice or James[5] off and drove around the block. Id. at 204. After picking up Maurice or James, Petitioner proceeded to 11th Street to pay the barber. Id. at 205.

---

[5] Petitioner could not remember which person got out of the car to purchase the marijuana.

Petitioner went into the barbershop, leaving Maurice and James in the car. _Id_. He reached in his pocket, but the money was not there. _Id_. Therefore, Petitioner went back to the car to see if he had dropped his money in the seat of the car. _Id_. There was some change on the seat, but no other money. _Id_. Petitioner asked Maurice and James if they had seen the money, and they said they had not. _Id_. at 205-06. Since they were unable to find the money, they returned to the apartment complex, where Petitioner parked in the spot by the stairway to his apartment. _Id_. at 206. Petitioner returned to his apartment. _Id_.

About an hour and a half later, Petitioner's wife and children arrived at the apartment. _Id_. at 207. Petitioner told his wife what had happened to his money. _Id_. He was a little upset about the missing money. _Id_.

At this point, Fiellah Teague, one of Maurice's cousins, knocked on the door. _Id_. at 207-08. Fiellah asked the Petitioner about the missing money, and then they went downstairs to search the car again for the money. _Id_. at 208. After they could not find the missing money, Fiellah said he was going to get Maurice and they would "take care of this" when he got back. _Id_. Petitioner told Fiellah not to bring Maurice back because he knew that they had been drinking and smoking marijuana earlier. _Id_. at 208-09. Fiellah said again that he would come back and take care of the matter. _Id_. at 210.

After Fiellah left, the Petitioner told his wife what had happened, and she said she was scared. Id. at 211. Therefore, the Petitioner told her to take the children to a relative's house. Id. Petitioner saw Fiellah returning in a van with three other people in it. Id. at 211-12. At this point, his wife handed the Petitioner a handgun and left with the children. Id. at 212. Petitioner did not know that his wife had this gun in their home. Id. at 223.

Petitioner then sat on his car, while Maurice, James and Fiellah approached. Id. at 213. Maurice said in a loud voice, "nigger, I didn't get your mother fucking money." Id. at 214. Petitioner did not want to argue with Maurice so he told him to "get back in the car and go on." Id. "Maurice got louder" and continued to walk towards the Petitioner. Id. Therefore, the Petitioner hit Maurice with his right hand, while holding the gun in his left hand. Id. at 214-15. Maurice jumped back up, and the Petitioner began to back away from him. Id. at 215. At this point, he was surrounded by James, Carl, Fiellah and Maurice. Id.

Petitioner continued to back away, and said, "somebody get him because I don't want to shoot him[.]" Id. at 216. Maurice then "swung and [the Petitioner] tripped." Id. At this point the Petitioner fell and "the gun went off." Id.

Petitioner dropped the gun and went upstairs into his apartment. Id. Other than the brief period of time described

above, the Petitioner never possessed that gun at any time that day. <u>Id</u>. at 218.

Shortly thereafter, Maurice started to bang on the door to Petitioner's apartment. <u>Id</u>. at 217. Petitioner opened the door "and there was Maurice making threats and shouting profanities at [him]." <u>Id</u>. Petitioner then left the scene, called a friend and asked for advice. <u>Id</u>. at 217-18. After speaking with his friend, he decided to return to the scene and turn himself in to the authorities. <u>Id</u>. at 218.

The state recalled Carl Randall as a rebuttal witness. <u>Id</u>. at 239. He testified that he had never seen Maurice Stevens with a gun and that Maurice did not have a reputation for possessing a gun or being violent. <u>Id</u>. at 239-40. The state then called Lynette McClary, who also testified that she had never seen Maurice with a gun and that Maurice did not have a reputation for possessing a gun or being violent. <u>Id</u>. at 242-43.

## VI. Findings of Fact and Conclusions of Law

Petitioner contends that he received ineffective assistance of counsel. Specifically, he contends that counsel was ineffective for: (1) failing to object to the introduction of inadmissible evidence of the crime of aggravated battery (the shooting of Maurice Stevens), which became a feature of the trial; and, (2) leading the Petitioner to believe that the defense of necessity or justification would be employed at trial, but the trial court

15

refused to give such an instruction on the ground that it was inapplicable.  Petitioner raised these ineffectiveness claims in his Rule 3.850 motion, and the trial court adjudicated them as follows:

>    In his first claim the defendant contends that counsel was ineffective for failing to object to trial evidence that the defendant shot someone.  That claim is utterly refuted by the record in this cause.  Not only did defense counsel file a motion in limine specifically addressing that question, the motion was argued, was preserved for appellate review, and was specifically an issue in the defendant's appeal.  Attached hereto as Exhibits A, B and C, respectively, are copies of the Defendant's First Motion in Limine, the defendant's Motion for New Trial, and the defendant's Statement of Judicial Acts to Be Reviewed.

>    The defendant's second claim is that counsel was ineffective for leading the defendant to believe that the defense of necessity or justification would be employed during trial because the Court refused to instruct the jury on that defense.  The defendant seems to suggest that counsel misled him into believing that the defendant could claim necessity even though such was not really a legal defense.  It seems obvious that trial counsel must have discussed a claim of necessity with the defendant as a written request for a jury instruction on the issue was filed.  However, even if counsel did advise the defendant that necessity was a valid defense, the defendant's testimony failed to establish that affirmative defense.

>    The defendant was cautioned by this Court about waiving his Fifth Amendment right to remain silent.  See attached excerpt from trial transcript as Exhibit D.  Nevertheless, the defendant opted to take the stand.  The defendant's testimony failed to establish all

of the prongs of the affirmative defense of necessity. This Court, the undersigned, declined the defendant's requested jury instruction because the defense was not established in the evidence, not because necessity was not a valid defense. An excerpt from the defendant's testimony is attached hereto as Exhibit E. An excerpt of this Court's ruling on defendant's requested jury instruction is attached hereto as Exhibit F. Furthermore, the matter of this Court's refusal to give the defendant's requested jury instruction was preserved for appeal and was specifically considered by the appellate court. A copy of the requested jury instruction is attached hereto as Exhibit G. See also, the Motion for New Trial and Statement of Judicial Acts to Be Reviewed which are referenced above.

Upon the foregoing, the Court concludes that the record in this cause negates the defendant's claims. . . .

Ex. F at 11-12.

This Court will not defer to the state court's adjudications of the ineffectiveness claims because the state court did not address the claims before it. With respect to the first ineffectiveness claim, the trial court appears to have construed this claim as a contention that counsel was ineffective for failing to preserve this issue for appellate review. However, Petitioner's claim (both in state court and in this Court) is that counsel was ineffective for failing to make contemporaneous objections to the introduction of the evidence of the shooting because he was prejudiced by the jury's consideration of this evidence, not because the issue was not preserved for appellate review.

With respect to the second claim, the trial court found that counsel was not ineffective because necessity was a legal defense to the charge, but the facts of the case did not support a necessity instruction. However, Petitioner's claim (both in state court and in this Court) is that he would have accepted the state's three-year plea offer if his attorney had not erroneously advised him that the facts of his case supported a necessity defense.

The state court did not address the specific claims before it. Thus, there is no state court adjudication of the claims to which this Court can defer. Accordingly, this Court will proceed to the merits of Petitioner's claims.

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted). The Eleventh Circuit captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Establishing these two elements is not easy: "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).

For assessing a lawyer's performance, _Chandler v. United States_, 218 F.3d 1305 (11th Cir. 2000) (en banc) _cert_. _denied_, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), sets out the basic law: "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." _Id_. at 1314 (internal marks omitted). . . . Our role in reviewing an ineffective assistance claim is not to "grade" a lawyer's performance; instead, we determine only whether a lawyer's performance was within "the wide range of professionally competent assistance." _See_ _Strickland_, 104 S.Ct. at 2066.

The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." _See_ _Chandler_, 218 F.3d at 1315. . . .

A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." _Strickland_, 104 S.Ct. at 2067. Instead, a petitioner must establish that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given adequate assistance. _See id_. at 2068.

_Van Poyck v. Florida Dep't of Corrections_, 290 F.3d 1318, 1322-23 (11th Cir. 2002) (per curiam) (footnotes omitted), _cert_. _denied_, 537 U.S. 812 (2002), 537 U.S. 1105 (2003).

In sum, "[w]ithout proof of both deficient performance and prejudice to the defense, . . . it could not be said that the

sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,' and the sentence or conviction should stand."   Bell v. Cone, 535 U.S. 685, 695 (2002) (internal citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

In Hill v. Lockhart, 474 U.S. 52, 58-59 (1985) (footnote omitted), the Court held:

> that the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence already set forth in Tollett v. Henderson, supra, and McMann v. Richardson, supra. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

The same two-part test also applies when a habeas petitioner asserts that, but for his counsel's ineffectiveness, he would have accepted a plea agreement; however, to show prejudice in such a case, the petitioner must show there is a reasonable probability that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial. Smith v. Singletary, 170 F.3d 1051, 1053 (11th Cir. 1999).

As noted previously, Petitioner claims that counsel was ineffective for failing to make contemporaneous objections to the introduction of the evidence of the shooting because he was prejudiced by the jury's consideration of this evidence.  The following facts are pertinent to this claim.

Prior to trial, defense counsel filed Defendant's First Motion in Limine, seeking to exclude evidence relating to the Petitioner's shooting of Maurice Stevens and any photographs depicting the blood stains of Maurice Stevens.  Ex. A at 40-42.  The trial court heard argument on the motion.  Ex. H at 102-11.  The trial court stated that "whether or not Mr. Stevens was shot I think that's an element of the state's proof, and I gather the firearm wasn't recovered." Id. at 111.  Thus, the Court found "that's probably appropriate for the state to make reference to that[.]"  Id.  Defense counsel did not make a contemporaneous objection when Maurice Stevens testified that the Petitioner shot him.  Ex. H at 145-46.

This Court is of the opinion that counsel's performance was not deficient.  Petitioner admitted that he had the gun; however, he argued that his possession of gun was justified.

> "[T]he law has long recognized that there may be circumstances under which a convicted felon's possession of a firearm would be justified and his conduct declared not criminal." Marrero v. State, 516 So.2d 1052, 1054 (Fla. 3d DCA 1987).  The Third District has described this "necessity" or "justification" defense to a violation of section 790.23 as follows:

> (1) the defendant must be in
> present, imminent, and impending
> peril of death or serious bodily
> injury, or reasonably believe
> himself or others to be in such
> danger; (2) the defendant must not
> have intentionally or recklessly
> placed himself in a situation in
> which it was probable that he would
> be forced to choose the criminal
> conduct; (3) the defendant must not
> have any reasonable, legal
> alternative to possessing the
> [firearm]; (4) the [firearm] must be
> made available to the defendant
> without preconceived design[;] and
> (5) the defendant must give up
> possession of the [firearm] as soon
> as necessity or apparent necessity
> ends.

> Marrero, 516 So.2d at 1055 (quoting State v.
> Crawford, 308 Md. 683, 521 A.2d 1193, 1200-01
> (1987)) . . . .

State v. Chambers, 890 So.2d 456, 457-58 (Fla. 2d DCA 2004).

Clearly, testimony concerning the whole series of events prior to, during and immediately after the shooting was necessary to establish the above-quoted elements of this defense. Furthermore, Petitioner was not prejudiced by counsel's alleged error because the evidence against him for the charge of possession of a firearm by a convicted felon was overwhelming. Thus, ground one is without merit.

In ground two, Petitioner claims that he would have accepted the state's three-year plea offer if his attorney had not erroneously advised him that the facts of his case supported a

necessity defense.   The following facts are pertinent to this claim.

Defense counsel requested that the trial court instruct the jury on the defense theory of necessity and/or justification, as set forth below:

> It is a defense to the offense of possession of a firearm by a convicted felon if you find the following:
>
> 1) defendant must be in present danger or imminent peril of death or serious bodily injury or reasonably believe to be in such danger,
>
> 2) defendant must not have intentionally or recklessly placed himself in a situation in which it was probable that he would be forced to chose the criminal conduct,
>
> 3) the defendant must not have any reasonable legal alternative to possessing the handgun,
>
> 4) the handgun must be made available to the defendant without preconceived design,
>
> 5) the defendant must give up possession of the handgun as soon as the necessity or apparent necessity ends.
>
> If, in your consideration of the issue of justification, you have a reasonable doubt on the question of whether or not the defendant was justified in the possession of a firearm, you should find him not guilty.  However, if from the evidence you're convinced that the defendant was not justified in the possession of the firearm, then you should find him guilty, if all the elements of the charge have been proven.

Ex. A at 58-59; Ex. H at 248.

Defense counsel also presented argument on why the instruction should be given.  Id. at 256-60, 266-75.  However, the trial court found that the evidence did not support giving the instruction. Id. at 275.

This Court finds that counsel's performance was not deficient because reasonable jurists could disagree whether there was sufficient evidence presented to warrant instructing the jury on the necessity defense.  Obviously, defense counsel thought there was sufficient evidence presented to warrant giving the instruction.  Appellate counsel agreed,[6] raising as the sole issue on appeal the trial court's error in failing to give the necessity instruction.  See Ex. B.  Appellate counsel succinctly summarized the testimony that supported the necessity instruction as follows:

> Appellant presented evidence pertaining to each of the elements of the defense. He testified that Maurice was known to be violent at times, and that he knew Maurice had been drinking and smoking during the day.  For that reason, he had asked Fiellah not to bring Maurice to his home, but Fiellah did so anyway.  When he saw Maurice approaching with his cousins, Fiellah and James, appellant sent his wife and children away out of concern for their safety, and only as she was leaving did his wife hand him the handgun, which he testified he did not know had been in their house.  In other words, it was a split second decision made as the threatening situation was

---

[6] Furthermore, it appears that the jury thought there was evidence presented that may have justified the Petitioner's possession of the gun because, during deliberations, the jury sent out the following question: "Could the defendant use, possess a firearm under any circumstances, self defense[?]"  Ex. H at 343-44.

> unfolding, and it was not his idea to have the
> gun in his possession.  He was apparently
> already outside his apartment door and in view
> of the three men when he came into possession
> of the gun.
>
> Appellant testified that after Maurice
> arrived, he started getting loud, and even
> after he told Maurice to go home, he continued
> to get louder; further, after he knocked
> Maurice down, Maurice got back up and kept
> coming at him, confirming his concern that
> Maurice was angry and violent and out of
> control. Maurice himself testified he was
> furious and had been drinking.  Appellant
> testified the three men surrounded him.  After
> the gun went off, appellant said he dropped it
> on the ground and went upstairs, and he did
> not know what happened to the gun.  No gun was
> located or presented at trial. . . .

Ex. B at 10-11.

In sum, this Court finds there was sufficient evidence presented to warrant instructing the jury on the necessity defense for the reasons stated by appellate counsel in the Initial Brief of Appellant (Ex. B).  Thus, defense counsel's advising Petitioner that necessity or justification was a viable defense in his case does not constitute deficient performance.

Thus, for all of the above-stated reasons, the Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.  The Petition is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this ___12th___ day of April, 2006.

HOWELL W. MELTON
United States District Judge

ps 4/12
c:
Levi L. Johnson
Ass't Attorney General Sherri Tolar Rollison